[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-11831
Non-Argument Calendar
_____

D.C. Docket No. 3:16-cv-01091-BJD-MCR

EMILY HOFFMAN,
SCOTT VADEN,

Plaintiffs - Appellants,

versus

OFFICE OF THE STATE ATTORNEY, FOURTH JUDICIAL CIRCUIT, et al.,

Defendants,

STEPHEN GRISSETT,
in his official capacity Asst. State Attorney for the Fourth Judicial Circuit,
JAMES COLAW,
in his official capacity Asst. State Attorney for the Fourth Judicial Circuit,
STEVE NELSON,
in his official capacity Asst. State Attorney for the Fourth Judicial Circuit,
RACHEL DEMERS,
in her official capacity Asst. State Attorney for the Fourth Judicial Circuit,
MELISSA NELSON,
in her official capacity as State Attorney,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(December 2, 2019)

Before MARTIN, ROSENBAUM, and NEWSOM, Circuit Judges.

PER CURIAM:

Plaintiffs Emily Hoffman and Scott Vaden, represented by counsel on appeal, appeal the district court's grant of a motion to dismiss their *pro se* civil-rights lawsuit filed under 42 U.S.C. § 1983 and state law against several prosecutors in the State Attorney's Office for the Fourth Judicial Circuit of Florida ("State Attorney's Office"). The plaintiffs' claims stem from their arrest and prosecution on charges arising out of a fraud investigation into the plaintiffs' actions at a local company. On appeal, Hoffman and Vaden argue that the district court erred in finding that their claims were barred by prosecutorial immunity or were otherwise not viable. We affirm.

**I.**

The relevant facts, as alleged in the operative amended complaint (the "complaint"), are as follows. In early February 2012, the Clay County Sheriff's Office began investigating a report by Mike Strobel, the owner of Air Technology Services, Inc. ("Air Tech"), that Hoffman, Air Tech's operations manager, had been

stealing customers and embezzling money from the company. The investigation was transferred to the financial-crimes unit and assigned to Detective William Roberts.

As part of the investigation, Roberts interviewed Hoffman on February 14, 2012. During the interview, Hoffman explained that she and two other Air Tech employees, Plaintiff Vaden and non-party Sam Pollak, had been in discussion with Strobel to purchase Air Tech. They intended to operate Air Tech along with two related businesses they had started. But their relationship with Strobel soured, according to Hoffman, when she raised concerns about Strobel's accounting practices. She ultimately reported these practices to the IRS. Hoffman denied stealing customers and suggested that Strobel was retaliating against her for reporting him to the IRS. At the end of the interview, the detective told her that "the matter was civil not criminal [and] that he would speak to the state attorney's office, but that he was sure the case would be closed."

The day after Hoffman's interview, Strobel contacted Stephen Grissett, who was a customer of Air Tech and an Assistant State Attorney ("ASA") at the State Attorney's Office. According to a letter Strobel sent Grissett, which was attached to the complaint, Air Tech had sold a geothermal air system to Grissett, but he still owed money on the contract. Strobel instructed Grissett not to pay Hoffman, Pollak, or their companies because Hoffman and Pollak were defrauding his customers and falsely representing that they had purchased Air Tech. After receiving this letter,

3

Grissett contacted Roberts and stated that he may have been defrauded by Hoffman. Grissett's allegation "resulted in the case going from civil to criminal."

On February 17, 2012, Roberts contacted the plaintiffs' bank and, without a subpoena or other legal process, had a freeze put on their accounts and requested their bank records. At some point thereafter, Roberts drafted a subpoena for those same records, even though he had already received them.

Meanwhile, Grissett continued to speak with Strobel and Roberts about the investigation. Grissett at one point indicated to Roberts that he was "on the fence" about participating in the case as a victim. Roberts asked Strobel to talk to Grissett and get him back on board. Strobel then offered to forgive Grissett's remaining debt of more than $10,000 if Grissett agreed to testify against the plaintiffs in any civil or criminal case against the plaintiffs. Grissett ultimately signed an affidavit against the plaintiffs in exchange for a receipt from Strobel indicating that the balance of his outstanding debt was paid in full.

On May 4, 2012, Hoffman and Pollak were arrested and charged with schemes to defraud and grand theft. ASA James Colaw was assigned to prosecute the case for the State Attorney's Office. At some point, ASA Rachel Demers took over the prosecution from Colaw, who was appointed as a judge.

After Hoffman's and Pollak's arrests, Colaw communicated with Pollak's counsel and persuaded Pollak to turn against Hoffman. Through counsel, Pollak told

4

Colaw that Hoffman was threatening him and telling him what to say in the case. Excited by the possibility of new charges, Colaw pressed Pollak's attorney for more information from Pollak, who then implicated Vaden as well. Colaw sought and obtained an arrest warrant against the plaintiffs for witness tampering "without taking sworn testimony or having a sworn affidavit from the material witness."

During discovery, Hoffman requested the sworn affidavit from Pollak to support the tampering charges and, when advised that no such affidavit existed, moved to compel the affidavit. A hearing was set on the motion to compel. Colaw represented the state at the hearing, even though Demers had taken over the case by that time. The court denied the motion to compel.

Just before the scheduled jury trial, Hoffman "entered a no contest best interest plea to a misdemeanor petit theft," and the original charges were dropped. She received a "withhold of adjudication." Vaden's charge of witness tampering was reduced to the misdemeanor offense of harassing a witness without entry of any plea. He was sent to pretrial intervention and the charge was dismissed. As a result of the prosecution against them, the plaintiffs "lost their two businesses, their business reputation, their personal reputation, friends, their home, personal property, their jobs and health insurance, which in turn led to Hoffman being without insurance when she was later diagnosed with breast cancer."

**II.**

5

The plaintiffs' *pro se* amended complaint raised a variety of federal and state claims against State Attorney Angela Corey and ASAs Colaw, Demers, Grissett, and Steve Nelson in their individual and official capacities. Under 42 U.S.C. § 1983, the plaintiffs alleged claims of malicious prosecution and seizure and concealment of evidence, unlawful search of bank records, municipal liability, and conspiracy to violate constitutional rights.[1] Under state law, they alleged claims of malicious prosecution, conspiracy, and intentional and negligent infliction of emotional distress. While the case was pending, Melissa Nelson replaced Corey as State Attorney and was substituted as defendant for the official-capacity claims against Corey, though Corey continued as a defendant in her individual capacity.

The plaintiffs complained of myriad and pervasive deficiencies in the prosecutions against them. According to the plaintiffs, (a) Colaw initiated the prosecutions against them without probable cause; (b) Corey and Colaw failed to recuse the State Attorney's Office from the prosecution despite knowledge of Grissett's role as a witness in the case; (c) the State Attorney's Office failed to list Grissett as a "category A" witness during discovery and concealed his role in the case; (d) Colaw and Demers continued the prosecution despite evidence showing

---

[1] The plaintiffs also brought a cause of action under 18 U.S.C. §§ 241 and 242, but these statutes "are criminal in nature and provide no civil remedies." *Hanna v. Home Ins. Co.*, 281 F.2d 298, 303 (5th Cir. 1960); *see Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all Fifth Circuit decisions prior to October 1, 1981).

that the plaintiffs were innocent; (e) Colaw and Demers withheld exculpatory evidence during discovery; (f) Grissett corruptly influenced the prosecution against them; (g) Colaw provided discovery from the criminal case to a former colleague who was representing Hoffman's former husband in a custody case; (h) the State Attorney's Office prepared a subpoena for the plaintiffs' bank records to cover up the fact that those records had already been obtained without legal process; and (i) Corey and Steve Nelson "sanctioned and approved" all of this conduct.

The defendants filed a motion to dismiss, which the district court granted in full. The plaintiffs now appeal, arguing that the court erred in reaching the following conclusions: (1) that Colaw was entitled to absolute prosecutorial immunity under § 1983; (2) that Grissett was not acting "under color of law," and thus not subject to suit under § 1983; (3) that the plaintiffs failed to show a causal connection between supervisors Corey and Steve Nelson and the alleged constitutional injuries under § 1983; and (4) that the state-law claims of malicious prosecution and intentional infliction of emotional distress failed on the merits.[2]

## III.

"Claims of absolute immunity present questions of law that we review *de novo*." *Mikko v. City of Atlanta, Ga.*, 857 F.3d 1136, 1142 (11th Cir. 2017).

_____

[2] We deem abandoned any other matters that were raised before the district court but not raised on appeal, and we do not discuss them further. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) (issues not raised on appeal are abandoned).

Likewise, we review *de novo* the grant of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Rivera v. Leal*, 359 F.3d 1350, 1353 (11th Cir. 2004). When conducting this review, we accept the allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Miljkovic v. Shafritz & Dinkin, P.A.*, 791 F.3d 1291, 1296–97 (11th Cir. 2015). To survive a motion to dismiss under Rule 12(b)(6), the "complaint must state a claim to relief that is plausible on its face, meaning it must contain factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quotation marks omitted).

## IV.

We first consider whether Colaw is entitled to prosecutorial immunity. We apply a "functional approach" when evaluating claims of prosecutorial immunity, "look[ing] to the nature of the function performed," not the identity of the actor. *Rivera*, 359 F.3d at 1353 (quotation marks omitted). The defendant prosecutor bears the burden of showing that prosecutorial immunity is "justified for the function in question." *Mikko*, 857 F.3d at 1142 (quotation marks omitted).

"A prosecutor is entitled to absolute immunity for all actions he takes while performing his functions as an advocate for the government" in the judicial phase of the criminal process. *Rivera*, 359 F.3d at 1353. The prosecutorial function includes the initiation and pursuit of a criminal prosecution, the presentation of the state's

case, and other actions that are "intimately associated with the judicial phase of the criminal process," such as court appearances. *Mikko*, 857 F.3d at 1142; *see Hart v. Hodges*, 587 F.3d 1288, 1295 (11th Cir. 2009) ("Prosecutors are immune for appearances before a court and conduct in the courtroom . . . ."). Prosecutorial immunity extends to "filing an information without investigation, filing charges without jurisdiction, filing a baseless detainer, offering perjured testimony, suppressing exculpatory evidence, . . . [and] threatening . . . further criminal prosecutions." *Hart*, 587 F.3d at 1295 (quotation marks omitted). In short, "[a] prosecutor is immune for malicious prosecution." *Id.*

Prosecutorial immunity, however, does not apply "when a prosecutor is not acting as an officer of the court but is instead engaged in certain investigative or administrative tasks." *Id.* at 1296. Prosecutors are not absolutely immune for "conducting investigative work before an arrest, making statements to the press, and providing legal advice to police regarding pre-indictment investigation techniques." *Id.* (citations omitted); *see Rivera*, 359 F.3d at 1353 (a prosecutor functions as an investigator when she "search[es] for the clues and corroboration that might give h[er] probable cause to recommend that a suspect be arrested"). Also, absolute immunity does not apply if the prosecutor is "a complaining witness." *Rivera*, 359 F.3d at 1353. A prosecutor functions as a complaining witness when she "personally swears to the truth of information [s]he shares with the court." *Id.* at 1354.

9

The plaintiffs argue that Colaw is not entitled to prosecutorial immunity because he functioned in an investigative or administrative capacity or as a complaining witness. We disagree.

Here, Colaw is entitled to absolute prosecutorial immunity. To begin with, under our binding caselaw, Colaw cannot be held liable for initiating and continuing prosecutions against the plaintiffs, even assuming he lacked probable cause at the outset and pursued the prosecutions after receiving overwhelming exculpatory information. *See Hart*, 587 F.3d at 1295. Our caselaw also requires us to conclude Colaw is likewise immune from liability for withholding exculpatory information during discovery, as well as for appearing before the court at a hearing on Hoffman's motion to compel. *See id.* While the plaintiffs assert that Colaw appeared for the hearing after his appointment as a judge, there is no indication that, despite the appointment, Colaw was not authorized to appear on behalf of the state at that time. As to Colaw's alleged failure to recuse due to Grissett's involvement, the decision whether to recuse from a prosecution is an action intimately associated with the judicial phase of the criminal process, little different conceptually than a decision to initiate or pursue a prosecution. *See id.*

Nor can we conclude that the complaint's allegations support the plaintiffs' contention that Colaw acted as an investigator or a complaining witness. The fact that Colaw relied on information obtained during the investigation, such as the

10

plaintiffs' bank records, or even that he was aware of others' investigatory conduct, is not the same thing as if Colaw personally engaged in investigatory conduct.[3]  Nor did Colaw act as an investigator when he solicited information from Hoffman's codefendant, Pollak, and then used that information to bring charges against the plaintiffs.  Prosecutorial immunity extends to "actions preliminary to the initiation of a prosecution and actions apart from the courtroom." *Buckley v. Fitzsimmons*, 509 U.S. 259, 272 (1993) (quotation marks omitted).  And negotiating with cooperating codefendants, and then bringing additional charges in light of new information, is conduct "fairly within [the prosecutor's] functions as an advocate." *Id.* at 273 (quotation marks omitted); *see Mullinax v. McElhenney*, 817 F.2d 711, 715 (11th Cir. 1987) (holding that the prosecutorial function includes "[o]ffering a witness immunity in exchange for his testimony").

Finally, while the plaintiffs' brief states that Colaw "signed under oath" the informations charging the plaintiffs, no such allegations appeared in their complaint.  Specifically, there are no allegations that Colaw personally swore to the truth of matters in the informations.  Accordingly, the allegations in the complaint fail to

---

[3] In their brief on appeal, the plaintiffs suggest that Colaw was personally involved in conducting an "illegal clandestine recording of a phone call" between Grissett and Pollak, but it appears from their allegations that this phone call occurred before Hoffman's arrest and, therefore, before Colaw was involved in the case.  No specific factual allegations in the complaint identify Colaw as involved in whatever recording may have been produced.

11

show that Colaw acted as a complaining witness by "personally swear[ing] to the truth of information he share[d] with the court." *Rivera*, 359 F.3d at 1354.

For all of these reasons, we agree with the district court that our prior precedent requires the conclusion that Colaw is entitled to absolute prosecutorial immunity against the plaintiffs' § 1983 claims.[4]

## V.

The plaintiffs next dispute the district court's conclusion that Grissett was not subject to suit under § 1983 because he was not acting under color of state law in the circumstances of this case.

Not all torts or other deprivations of rights committed by a person who is a government agent are cognizable under § 1983. *Myers v. Bowman*, 713 F.3d 1319, 1329 (11th Cir. 2013). "Section 1983 instead punishes only actions committed 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia.'" *Id.* (quoting 42 U.S.C. § 1983). A plaintiff asserting a claim under § 1983 must show (1) that she was deprived of a federal right (2) by a person acting under color of law. *Id.*

The mere fact that Grissett was a state employee does not mean that he acted under color of state law. "The traditional definition of acting under color of state

---

[4] The plaintiffs' allegations regarding Colaw's interactions with a former colleague, who was representing Hoffman's ex-husband in a custody case, are conclusory in nature and fail to show that any information obtained affected the prosecution against Hoffman.

12

law requires that the defendant in a [section] 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* (quotation marks omitted).  Actions taken in the defendant's role as a private person are not under color of law. *Id.*  So "[t]he dispositive issue is whether the official was acting pursuant to the power he/she possessed by state authority or acting only as a private individual," because a government agent "cannot be held liable [under § 1983] for a constitutional tort when he acts in a private capacity." *Id.* at 1330.

In *Myers*, we held that a judge did not act under color of state law when he reported to the police that someone had stolen his dog. *Id.*  We noted that the "theft occurred in connection with a private dispute and not a matter that was before [the judge] in his official capacity as a magistrate judge, and [the judge] alleged a theft of private property, not any property that belonged to the government." *Id.* Although the judge reported the theft using his government-issued communications system, that fact did not mean that the judge acted under color of law because "there [was] no reason to believe that [the judge] would not have done, or been able to do, what [he] did" without the government system. *Id.* at 1330–31 (quotation marks omitted).  Moreover, we explained that the fact that the judge's position influenced others was not enough to show that the judge acted under state law. *Id.* at 1331.  In evaluating these kinds of issues, we explained, our focus is on the conduct of the

13

defendant, not the victim or a third-party.  *Id.*  And the record in *Myers* did not show that the judge acted pursuant to the power he possessed by state authority, "[n]or was the arrest made possible only because [the judge] [wa]s clothed with the authority of state law."  *Id.* (quotation marks omitted).

Here, the allegations of the complaint, even accepted as true, show that Grissett acted as a private citizen, and "not in his official capacity or while exercising his responsibilities pursuant to state law."  *Id.* (quotation marks omitted).  Grissett reported to Detective Roberts that he may have been defrauded in relation to a private purchase he had made from Hoffman's former employer, Air Tech, and he then signed an affidavit against Hoffman and cooperated with the investigation.  He did not take any official action with respect to the prosecution against Hoffman.  Because Grissett's involvement stemmed from a private dispute and any other private person could have done what he did, he did not act under color of law.  *See Butler v. Sheriff of Palm Beach Cty.*, 685 F.3d 1261, 1268 (11th Cir. 2012) ("[A]ny private citizen can submit a report to law enforcement and seek criminal charges against another person.").

The plaintiffs argue that Grissett acted under color of law because he used his official email and computer to view case-related documents, email Pollak and Roberts, and prepare the affidavit, and he had a state employee notarize the affidavit.  Like the judge's use of the government-issued communications system to report his

14

dog stolen in *Myers*, however, Grissett's specific uses of government resources here does not render his conduct to be under color of law. Grissett could easily have used a personal email or computer to report the crime, email others, and prepare the affidavit, and he could have had the affidavit notarized by any other notary. There is no reason to believe that Grissett would not have done, or been able to do, what he did here without his access to and use of these government resources. *See Myers*, 713 F.3d at 1330–31; *see also Butler*, 685 F.3d at 1267–68 (corrections officer did not act under color of law, even though she used the gun and handcuffs she carried while on duty to detain and assault a young man at her home).

The plaintiffs also contend that Grissett's position as an ASA influenced others in the investigation and prosecution and that his "credibility" resulted in the case's progression from a civil one to a criminal one. But as we have previously explained, "the primary focus of the color of law analysis must be on the conduct of the [defendant], not the victim or a third-party." *Myers*, 713 F.3d at 1331. And the allegations of the complaint do not support a plausible inference that Grissett acted pursuant to the power he possessed by authority. *See id.* Nor was the plaintiffs' "arrest made possible only because [Grissett] [wa]s clothed with the authority of state law." *Id.* (quotation marks omitted). Although Grissett's allegation of being defrauded by Hoffman resulted in Roberts's decision to pursue the case as a criminal

15

rather than civil matter, there is little to show that Roberts would have acted differently if Grissett was not an ASA.

Reviewing the allegations as a whole, we cannot conclude that they give rise to a plausible claim that Grissett acted under color of law.  And because Grissett did not act under color of state law, he is not liable under § 1983.

## VI.

Next, we address whether the plaintiffs stated a claim of supervisory liability under § 1983 against Corey and Steve Nelson in their individual capacities.

A supervisor is not liable under § 1983 for the unconstitutional acts of her subordinates unless she either "directly participated in the unconstitutional conduct" or "a casual connection exists between the supervisor's actions and the alleged constitutional violation." *Keith v. DeKalb Cty., Ga.*, 749 F.3d 1034, 1047–48 (11th Cir. 2014).  A causal connection can be shown where a supervisor's policy or custom results in deliberate indifference to constitutional rights or "when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (quotation marks omitted).

Here, the district court did not err in concluding that the plaintiffs failed to state a claim for § 1983 supervisory liability against Corey and Nelson.  The plaintiffs argue that they established a causal connection by showing that the State

Attorney's Office had policies or customs of violating defendants' constitutional rights in various ways. But these policies or customs are little more than a restatement of the alleged wrongful acts committed against the plaintiffs in this case.

"In order for a plaintiff to demonstrate a policy or custom, it is generally necessary to show a persistent and wide-spread practice." *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004) (quotation marks omitted); *see Goebert v. Lee Cty.*, 510 F.3d 1312, 1332 (11th Cir. 2007) ("A custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law."). Nothing of the sort has been alleged here. The incidents identified by the plaintiffs, though numerous, are isolated from each other and based solely on the facts of this case. They do not demonstrate persistent and widespread practices. Simply calling something a "custom" does not make it so. Accordingly, the plaintiffs have "failed to meet the extremely rigorous standard for supervisory liability." *West v. Tillman*, 496 F.3d 1321, 1329 (11th Cir. 2007).

The plaintiffs also contend that they established a causal connection by showing that Corey and Nelson were aware of the alleged wrongful conduct and failed to stop it. *See Cottone*, 326 F.3d at 1360. The complaint's allegations fail to support this argument, though. In the main, the plaintiffs alleged without any supporting factual allegations that Corey and Nelson were aware of what Colaw was doing "through the chain of command." They also alleged, again without supporting

17

factual allegations, that Corey and Nelson "acquiesce[d]," "approved," or "sanctioned" Colaw's conduct. Because the plaintiffs' claims of supervisory liability are supported by conclusory allegations, the complaint does not contain sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Miljkovic*, 791 F.3d at 1296–97.

In any event, it would be exceedingly odd if Colaw was entitled to absolute prosecutorial immunity for his conduct in relation to the plaintiffs' prosecution, as we have concluded above, but Colaw's supervisors were not entitled to the same immunity for approving or failing to prevent that same conduct. The Supreme Court agrees. In *Van de Kamp v. Goldstein*, the Court explained that, where a prosecutor is entitled to absolute immunity for certain conduct, a supervisory prosecutor should likewise be entitled to absolute immunity for supervision or training of that same conduct. *See* 555 U.S. 335, 345–46 (2009). Were the rule otherwise, prosecutors' offices would be subject to suit "in virtually every case in which a line prosecutor makes a mistake for which he is personally immune." *Schneyder v. Smith*, 653 F.3d 313, 333–34 (3d Cir. 2011). And that, in turn, would undermine the primary purpose of prosecutorial immunity, which is to "protect[] the proper functioning of the office," rather than the individual prosecutor. *Van de Kamp*, 555 U.S. at 345–47 (quotation marks omitted).

18

Here, the plaintiffs' claims against Corey and Nelson in their capacity as supervisors are all directly connected to Colaw's conduct in the individual prosecutions against the plaintiffs.  In other words, the claims "rest[] in necessary part upon a consequent error by an individual prosecutor" in those prosecutions.  *Id.* at 346.  In a case like this, the same concerns that underlie prosecutorial immunity for the frontline prosecutor also apply to supervisory prosecutors.  *Id.* at 346–47.  In sum, because Colaw is entitled to prosecutorial immunity for his conduct, so too are Corey and Nelson for supervising that conduct.  *See id.* at 345–48.

## VII.

Finally, we consider whether the plaintiffs stated claims under state law for malicious prosecution and intentional infliction of emotional distress.

## A.

Under Florida law, a plaintiff bringing a claim for malicious prosecution must prove, among other elements, that there was a "bona fide termination" of the proceeding in her favor and "an absence of probable cause" for the proceeding. *Alamo Rent-A-Car, Inc. v. Mancusi*, 632 So. 2d 1352, 1355 (Fla. 1994).

The phrase "bona fide termination" means that the proceeding "ended in a manner indicating the original defendant's (and current plaintiff's) innocence of the charges or allegations." *Doss v. Bank of Am., N.A.*, 857 So. 2d 991, 994 (Fla. Dist. Ct. App. 2003).  A proceeding that ends due to "bargaining or negotiat[ion]" is

19

usually, though not always, insufficient to constitute a "bona fide termination" of the proceeding.  *Id.* at 995; *see Alamo Rent-A-Car*, 632 So. 2d at 1356 ("[I]f the bargaining constitutes nothing more than a promise to pay what was offered before the charges were brought, and the negotiations reflect the accused's innocence, then the termination would still be bona fide."); *Union Oil of Cal. Amsco Div. v. Watson*, 468 So. 2d 349, 353 n.3 (Fla. Dist. Ct. App. 1985) ("'Bona fide' . . . means that the termination was not bargained for or obtained by the accused upon a promise of payment or restitution.").  The critical question is whether the termination of the proceeding indicates the proceeding's "lack of merit," which depends on the totality of the circumstances.  *Doss*, 632 So. 2d at 995; *see Cohen v. Corwin*, 980 So. 2d 1153, 1155–56 (Fla. Dist. Ct. App. 2008).

Here, the district court did not err in concluding that the plaintiffs failed to establish the element of a "bona fide termination."  As to Hoffman, the plaintiffs contend that the court failed to recognize that two of her charges were dismissed. But these charges were dismissed as part of a plea agreement with the state prosecutors, under which she agreed to plead guilty to misdemeanor petit theft. Because the proceeding against Hoffman ended due to bargaining that resulted in a guilty plea to a lesser-included offense, she cannot establish the element of "bona fide termination" in her favor.  *See Alamo Rent-A-Car*, 632 So. 2d at 1356; *Doss*, 857 So. 2d at 994.

20

As to Vaden, we agree with the district court that the resolution of the witness-tampering charge against him does not reflect a "bona fide termination" in his favor. Vaden's charge was dismissed after he agreed to participate in the pretrial intervention program, which permits "first offender[s]" the opportunity to have criminal charges dismissed without prejudice. Fla. Stat. § 948.08(2). The nature of the program itself indicates that dismissal does not relate to "innocence of the charges or allegations." *Doss*, 857 So. 2d at 994; *Swartsel v. Publix Super Markets, Inc.*, 882 So. 2d 449, 452 (Fla. Dist. Ct. App. 2004) (explaining that the program's "primary purpose is to allow first offenders who, by definition, are subject to being found guilty of the crime charged, to avoid a conviction on their record by successfully completing the program and having a nol pros entered"), *abrogated on other grounds by State Farm Mut. Auto. Ins. Co. v. Nichols*, 932 So. 2d 1067 (Fla. 2009).

Although Vaden may not have been required to complete the terms of pretrial intervention before the charge was dismissed, that fact alone does not indicate that the dismissal was based on his innocence. The dismissal was still contingent on a negotiated agreement to participate in the pretrial intervention program, and the plaintiffs identify no other circumstances tending to show that the prosecutor concluded that the "evidence is lacking and that the charges are not provable." *See*

21

*Swartsel*, 882 So. 2d at 451 (holding that a dismissal of charges after participation in the pretrial intervention program did not constitute a "bona fide termination").

Because the plaintiffs have not plausibly alleged a "bone fide termination" of the proceedings in their favor, we need not and do not address whether probable cause supported the proceedings against them.  We affirm the dismissal of their state-law malicious-prosecution claims.

**B.**

To state a claim of intentional infliction of emotional distress, the plaintiff must allege that "1) the defendant acted recklessly or intentionally; 2) the defendant's conduct was extreme and outrageous; 3) the defendant's conduct caused the plaintiff's emotional distress; and 4) plaintiff's emotional distress was severe." *Johnson v. Thigpen*, 788 So. 2d 410, 412 (Fla. Dist. Ct. App. 2001).  Liability will be found "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* (quoting *Metropolitan Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278–79 (Fla. 1985)).

Here, we agree with the district court that the plaintiffs' claim for intentional infliction of emotional distress is due to be dismissed.  The plaintiffs allege various wrongdoings and unconstitutional practices in the prosecution against them, and if these allegations are true, the plaintiffs should certainly consider reporting the

defendants to the Florida Bar.  But that is not the standard for sustaining a claim of intentional infliction of emotional distress.  And as regrettable as some of the conduct the plaintiffs allege is, we cannot say the plaintiffs' allegations reflect conduct that satisfies the standard of being so "extreme and outrageous" as to "go beyond all possible bounds of decency," particularly where, as we have noted, the plaintiffs' agreement to less than an outright dismissal or acquittal of the charges brought against them could be viewed as a concession of at least some validity of the underlying charges.  We therefore affirm the dismissal of this claim.

## VIII.

For the reasons stated, we affirm the dismissal with prejudice of this action.

**AFFIRMED.**